UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

ANDRE SCOTT,

               Petitioner,

          v.

HAROLD D. GRAHAM, SUPERINTENDENT
OF AUBURN C.F.,

               Respondent.

------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: October 22, 2018

16 Civ. 2372 (KPF) (JLC)

OPINION AND ORDER
ADOPTING REPORT AND
RECOMMENDATION

KATHERINE POLK FAILLA, District Judge:

Pending before the Court is the June 29, 2017 Report and Recommendation of United States Magistrate Judge James L. Cott (the "Report" (Dkt. #39)), recommending that Petitioner Andre Scott's petition for *habeas corpus* relief under 28 U.S.C. § 2254 (the "Petition" (Dkt. #1)) be denied in its entirety. The Court has reviewed both the Report and Petitioner's July 10, 2017 Objection to that Report (the "Objection" (Dkt. #40)), and finds that the Report should be adopted in full. Accordingly, the Petition is denied.

## BACKGROUND

This summary draws its facts from the detailed recitation in Judge Cott's Report. (Report 1-13). On December 1, 2009, Petitioner was indicted by a grand jury for rape, sexual abuse, and assault arising from two alleged altercations with his girlfriend earlier that year. (*Id.* at 6). In the first, alleged to have occurred on August 22, 2009, Petitioner raped his girlfriend after pushing her down onto a bed and choking her. (*Id.* at 3). In the second,

alleged to have occurred on October 29, 2009, Petitioner repeatedly punched,

kicked, and hit his girlfriend because she had not called him "all day" and "was

ignoring his calls." (*Id.* at 4). On April 14, 2011, after being convicted by a jury

of all charges, Petitioner was sentenced to 20 years of incarceration followed by

10 years of post-release supervision. (*Id.* at 7-8).

Petitioner appealed to the Appellate Division, which affirmed the

convictions on March 31, 2015. *See People* v. *Scott*, 126 A.D.3d 645 (1st Dep't

2015). On June 15, 2015, the Court of Appeals denied leave to appeal. *See*

*People* v. *Scott*, 24 N.Y.3d 1171 (2015).

The Petition in this case raises five grounds for relief that echo

Petitioner's arguments to the First Department: (i) the prosecution suppressed

exculpatory footage during Petitioner's trial, thereby violating his due process

rights; (ii) the trial court violated Petitioner's right to present a defense by

excluding from evidence a controlled call from the victim to Petitioner; (iii) the

verdict was against the weight of the evidence; (iv) the aggravated harassment

statute under which Petitioner was convicted had been held to be

unconstitutional; and (v) Petitioner's sentence should be reduced because it

involved a substantial trial penalty and was not consonant with mitigating

facts. (Report 11-12). The Report found each of these bases to be insufficient.

(*Id.* at 20-58). Specifically, Judge Cott found Petitioner's second and fourth

claims to be procedurally barred, thereby agreeing with the First Department's

determination that Petitioner had failed to comply with New York's

contemporaneous objection rule. (*Id.* at 20-36). He then found that Petitioner's first claim and a portion of his fifth claim, while both exhausted, were not meritorious. (*Id.* at 37-47). Finally, Judge Cott found that Petitioner's third claim, as well as certain of his sentencing challenges, were not cognizable on habeas review. (*Id.* at 47-58).

On July 17, 2017, Petitioner timely filed his Objection to the Report. (Dkt. #40). While the Objection is not a model of clarity, the Court construes Petitioner's argument as follows: Because Petitioner and the victim engaged in a consensual sexual relationship prior to, and after, the August 22, 2009 incident, the sexual encounter on that date was consensual as well.

## DISCUSSION

A court may accept, reject, or modify, in whole or in part, the findings or recommendations made by a magistrate judge. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *Grassia* v. *Scully*, 892 F.2d 16, 19 (2d Cir. 1989). A court may accept those portions of a report to which no "specific, written objection is made," as long as the factual and legal bases supporting the findings are not clearly erroneous. *See Greene* v. *WCI Holdings Corp.*, 956 F. Supp. 509, 513 (S.D.N.Y. 1997) (quoting Fed. R. Civ. P. 72(b)); *see also Thomas* v. *Am*, 474 U.S. 140, 149 (1985). A magistrate judge's decision is clearly erroneous only if the district court is "left with the definite and firm conviction that a mistake has

been committed." *Easley* v. *Cromartie*, 532 U.S. 234, 235, 242 (2001) (quoting *United States* v. *U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

To the extent that a petitioner makes specific objections to a magistrate judge's findings, the reviewing court must undertake a *de novo* review of the objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *United States* v. *Male Juvenile*, 121 F.3d 34, 38 (2d Cir. 1997). *Pro se* filings are read liberally and interpreted "to raise the strongest arguments that they suggest." *Pabon* v. *Wright*, 459 F.3d 241, 248 (2d Cir. 2006) (internal quotation marks and citation omitted). However, where objections are "conclusory or general," or where the petitioner "simply reiterates his original arguments," the report should be reviewed only for clear error. *Walker* v. *Vaughan*, 216 F. Supp. 2d 290, 292 (S.D.N.Y. 2002) (internal quotation marks and citation omitted).

Because Petitioner's Objection is both conclusory and general, this Court has reviewed the Report for clear error. The Court finds that the Report's reasoning — which is set forth in commendable detail over nearly 28 of the Report's 59 pages — is sound and grounded in fact and law. Accordingly, the Court finds no clear error and adopts the Report in its entirety.

## CONCLUSION

For the foregoing reasons, the Court adopts Magistrate Judge Cott's thoughtful and comprehensive Report in full. Accordingly, it is hereby ordered that Petitioner's petition for a writ of *habeas corpus* is DENIED. The Clerk of

Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

The Court further certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Opinion and Order would not be taken in good faith; therefore, *in forma pauperis* status is denied for purposes of an appeal. *See Coppedge* v. *United States*, 369 U.S. 438, 444-45 (1962).

SO ORDERED.

Dated:     October 22, 2018
           New York, New York

_____
          KATHERINE POLK FAILLA
          United States District Judge

*Copies of this Order and the Report Were Sent by First Class Mail to*:
Andre Scott
11-A-1841
Auburn Correctional Facility
P.O. Box 618
Auburn, NY 13024

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
ANDRE SCOTT,

                Petitioner,

                -v-

HAROLD D. GRAHAM,

                Respondent.
------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6/29/17

**REPORT AND
RECOMMENDATION**

16-CV-2372 (KPF) (JLC)

**JAMES L. COTT, United States Magistrate Judge.**

**To the Honorable Katherine Polk Failla, United States District Judge:**

*Pro se* petitioner Andre Scott seeks a writ of habeas corpus pursuant to 28

U.S.C. § 2254 following his conviction of one count of rape in the first degree, one

count of assault in the second degree, two counts of assault in the third degree, and

two counts of aggravated harassment in the second degree. As a second felony

offender, Scott was sentenced to an aggregate term of 20 years of incarceration and

10 years of post-release supervision. For the reasons discussed below, I recommend

that the petition be denied.

## I. BACKGROUND

### A. Overview of Charges

The following facts are drawn from the record of Scott's proceedings in state

court.[1] In light of Scott's conviction, the Court summarizes the facts in the light

---

[1] The state-court record ("SR.") is filed as exhibits 1-5 of docket entry 31. Pinpoint
citations to these filings refer to the pagination that runs throughout all exhibits.

most favorable to the verdict. *See, e.g., Garbutt v. Conway,* 668 F.3d 79, 80 (2d Cir. 2012).

During the summer of 2009, Andre Scott and L.R. began a consensual sexual relationship. TR. at 20, 22.[2] On October 30, 2009, the police arrived at L.R.'s apartment in response to a call made by her mother. *Id.* at 250, 285. That day, L.R. reported to the police that Scott had attacked her in the early morning hours of October 30, and also reported that Scott had raped her on August 22. *Id.* at 80-81, 86. Scott was arrested and a grand jury indicted him for rape, sexual abuse, and assault related to the August incident, and for assault and aggravated harassment related to the October incident. *Id.* at 335-36; SR. at 25-29.

On January 11, 2011, Scott proceeded to a bench trial before then-New York State Supreme Court Justice, the Honorable Analisa Torres. TR. at 1. Scott was subsequently convicted of one count of rape in the first degree, one count of assault in the second degree, two counts of assault in the third degree, and two counts of aggravated harassment in the second degree, and is currently serving an aggregate sentence of 20 years incarceration and 10 years post-release supervision. *Id.* at 742; TS. at 909-10.

---

The trial transcript ("TR.") is filed as exhibits 7-22 of docket entry 31. The sentencing transcript ("TS.") is filed as part of exhibit 22 of docket entry 31.

[2] By Memorandum Order dated November 17, 2016, the Court granted respondent's request to file the state-court record and trial transcript with the Clerk of the Court on the docket with the names of the victim (and her mother and child) redacted, and to file unreacted copies of these documents under seal. The Court will thus refer to the victim simply by her initials, and to her mother by her first name only. Dkt. No. 29.

## B. The Trial

### 1. The Prosecution's Case

The prosecution's case, which included testimony from five witnesses, established the following.[3] L.R. was 19 years old when she met Scott in early July 2009. TR. at 10. The two began a consensual sexual relationship, seeing each other every day. *Id.* at 20, 22. L.R. testified that, on the morning of August 22 and after accusing her of receiving a call from a male friend, Scott slapped her and she fell to the bed. *Id.* at 30-31. According to L.R., after Scott struck her, her cheek felt swollen, her lip was bleeding, and her front tooth was chipped. *Id.* at 35-36. L.R. also testified that, later the same morning and after apologizing to her, Scott "pushed" her down onto the bed, choked her with "a lot of pressure," unbuttoned her pants, and put his penis inside her vagina. *Id.* at 37, 40, 42. L.R. testified that she was "saying stop" and "kicking him." *Id.* at 41. According to L.R., on that morning, she had not wanted to have sex with Scott and had not consented to his putting his penis in her vagina. *Id.* at 44. L.R. testified that she was dizzy and eventually "passed out." *Id.* at 41, 44. She said the last thing she remembered feeling or thinking before she passed out was, "I was going to be dead or raped." *Id.* at 44.

L.R. testified that the following week, she went with Scott to a dentist to seek treatment for her chipped tooth. *Id.* at 61. She testified that, in order to avoid

---

[3] The prosecution's five witnesses were: L.R. (TR. at 2-212); Robert Chin, an emergency physician testifying as a medical expert (*id.* at 224-47); Noh Swonjin, the police officer who responded to L.R.'s mother's call (*id.* at 247-69); Tiny, L.R.'s mother (*id.* at 270-313); and Lissette Gutierrez, a New York City Police Department ("NYPD") Detective (*id.* at 331-49).

telling the dentist that Scott had slapped her, she lied and said that she had chipped her tooth chewing a cheese doodle. *Id.* at 61.

L.R. testified that her relationship with Scott continued after August 22, and that she felt that, "there was no way not to talk to" Scott because he would become "aggressive and say that he is not going anywhere or [would] basically threaten[ ]" her if she told him she "didn't want to be bothered or . . . needed time to" herself. *Id.* at 63, 65.

L.R. testified that, late at night on October 29, 2009, she and Scott were in her apartment with her mother and son when Scott asked her to go to the store with him. *Id.* at 72-73. According to L.R., Scott was upset because she had not called him "all day" and "was ignoring his calls." *Id.* at 71. They began to argue when they exited L.R.'s apartment building, and Scott started "pushing and shoving" her as she was "trying to walk away from him." *Id.* at 74, 71. L.R. testified that Scott told her, "if you can't go anywhere with me, you won't go anywhere," and that he threatened to "disfigure [her] face so [she] wouldn't be able to see or walk or do anything else." *Id.* at 75.

L.R. then testified that she went back inside the building but "didn't get to the apartment," and that she was in the vestibule "in between the two doors" when Scott punched her twice and she fell to the ground. *Id.* at 76-77. According to L.R., Scott repeatedly hit and kicked her as she lay on the ground, and hit her with the building door. *Id.* at 77. L.R. testified that she called for her mother, who eventually came out of the apartment, and that Scott then ran away. *Id.* at 22.

L.R.'s mother, Tiny, testified that she heard L.R. screaming and saw Scott making a punching motion when she opened the door. *Id.* at 279. According to Tiny, Scott fled and she called the police. *Id.* at 279, 285. The police responded and canvassed the neighborhood but did not find Scott. *Id.* at 254. They brought L.R. back to the precinct to interview her. *Id.* at 257. At the police station, L.R. executed a written statement to the police about the incident that day. *Id.* at 81. She did not discuss the August 22 incident. *Id.* at 81-82.

After the attack, Scott called L.R.'s cell phone 30-40 times and left her a voicemail in which he cursed and accused her of reporting him to the police. *Id.* at 82-84, 104. L.R.'s mother testified that she answered the phone once and told Scott to stop calling, to which he replied "you the one that called the police on me," and threatened to break her jaw. *Id.* at 288, 306.

Later that same day, several of L.R.'s family members and a family friend, Reggie Smith, gathered at her apartment. *Id.* at 82, 84-85. In the course of talking about what had happened, L.R. "broke down" and told Smith and others about the August 22 incident. *Id.* at 85. L.R testified that the group encouraged her to report the incident, and she returned to the police station. *Id.* at 86-87.

L.R. met with NYPD Detective Lissette Gutierrez of the Manhattan Special Victim's Division on October 30. *Id.* at 335, 338. In Gutierrez's presence and at her direction, L.R. made a "controlled" telephone call to Scott that was recorded. *Id.* at 191, 348-49.

On November 10, Detective Gutierrez arrested Scott. *Id.* at 335-36. On December 1, a grand jury indicted Scott for rape, sexual abuse, and assault related to the August 22 incident, and for assault and aggravated harassment related to the October 30 incident. SR. at 25-29.

## 2. The Defense Case

The defense sought to attack the prosecution's case by undermining L.R.'s credibility. Scott's trial counsel cross-examined L.R. and questioned her about inconsistencies in her testimony, her delay in reporting the rape, and an alternative explanation for how she chipped her tooth. TR. at 117-28, 148-51, 142-43. During L.R.'s cross-examination, Scott's counsel unsuccessfully sought to elicit statements made by Scott during the controlled call on October 30, 2009. *Id.* at 192-198.

Scott's counsel called three witnesses to testify: Janeryl Browne, Scott's niece and a childhood friend of L.R. (*id.* at 378-457); Nayoka Thomas-Parker, a co-worker of L.R. (*id.* at 459-477); and Scott himself (*id.* at 478-734)

In his testimony, Scott denied assaulting and raping L.R. on August 22. *Id.* at 625-27. Scott testified that he argued with L.R. on October 30, but denied punching or kicking her. *Id.* at 649-51; 665-66. According to Scott, as he was trying to leave the vestibule of L.R.'s apartment, she grabbed his arm, and when he swung his arm backwards to shake her off, his elbow hit her. *Id.* at 659-60. Scott testified that when he was opening the door to exit the apartment, the door hit L.R. *Id.* at 662-63.

Scott also testified that L.R. called him in early August 2009 after getting in a fight and told him that a boy had punched her in the face. *Id.* at 503, 507-08, 608. According to Scott, he noticed the night of the fight that L.R.'s lip and jaw were swollen, but that he could not see her teeth because she was avoiding showing her face. *Id.* at 509, 613. Scott testified that the next day, L.R. showed him that one of her teeth had been knocked out. *Id.* at 512-13.

Janeryl Browne testified that L.R. was involved in a group fight in early August 2009 and that, during the fight, L.R. had punched a man and he had punched her back. *Id.* at 381-83, 389-90. She testified that, at the time, she did not see if L.R. had any broken or missing teeth. *Id.* at 433-34, 436. Nayoka Thomas-Parker testified that, at some point in August, she noticed that L.R. had been absent from work for two days and had returned with a broken tooth. *Id.* at 460, 475. According to Thomas-Parker, she asked L.R. what had happened, and L.R. replied that, "she confronted a guy in the street and he punched her in the face." *Id.* at 460.

### 3. Verdict and Sentencing

On January 19, 2011, Justice Torres found Scott guilty of one count of rape in the first degree, one count of assault in the second degree, two counts of assault in the third degree, and two counts of aggravated harassment in the second degree.[4]

---

[1] There is a discrepancy between the verdict minutes and the sentencing minutes regarding Scott's convictions. The sentencing minutes and the sentencing commitment sheet reflect his conviction of all counts charged except sexual abuse. ST. at 48; SR. at 6-7. However, the minutes of the verdict indicate that the Court acquitted Scott of second-degree assault and one aggravated harassment charge.

TR. at 742, 909-10. On April 14, 2011, after determining that he was a second felony offender, Justice Torres sentenced Scott to a term of 20 years of incarceration and 10 years of post-release supervision for the count of rape in the first degree. TS. at 38. For assault in the second degree, Scott was sentenced to a term of five years; for the two counts of assault in the third degree, Scott was sentenced to a term of one year for each count; and for the two counts of aggravated harassment in the second degree, Scott was sentenced to a term of one year for each count. *Id.* at 38. All terms were to be served concurrently, and thus Scott received an aggregate sentence of 20 years to be followed by 10 years of post-release supervision. *Id.* at 38.

## C. Post-Conviction Proceedings in State Court

### 1. Undisclosed HBO Footage

On January 10, 2011, the day before the trial began, the prosecution gave defense counsel a 136-page trial disclosure packet. SR. at 164, 190. Included in the packet were 14 pages of handwritten notes from the two Assistant District Attorneys ("ADAs") involved in the case. *Id.* at 165. These pages included notes ADA Melissa Penabad took during an interview with Reggie Smith, the family friend who was at L.R.'s apartment on October 30, 2009. *Id.* at 165, 215. ADA

---

TR. at 909-10. Scott's counsel noted this discrepancy in the § 440.10 motion and on direct appeal. SR. at 84 n.1, 304 n.12. In opposing the petition, respondent argued that it is "notable that trial counsel did not raise any issue regarding the counts for which petitioner was sentenced," and that the "trial counsel's lack of reaction at sentencing and the notations indicating guilty verdicts for these counts in the Supreme Court Worksheet suggest that the reporter's notes inaccurately reflected the court verdict." Respondent's Memorandum of Law in Opposition, dated November 18, 2016, Dkt. No. 30 ("Resp. Mem.") at 13.

Penabad's notes include the words: "asked her you know what rape is – she said no," and "when discussed forced sex – she cried + had to sit down," and "told her to report it." *Id.* at 215. These notes were disclosed to defense counsel a day before L.R. testified, and two days before the defense cross-examined her.

On October 3, 2011, following trial and sentencing, the prosecution sent Scott's trial counsel a copy of video footage of a conversation between ADA Penabad and her supervisor at the District Attorney's Office. SR. at 232; Resp. Mem. at 14. Home Box Office ("HBO") had filmed the conversation in late 2009 or early 2010 in connection with a documentary concerning the Sex Crimes Unit of the District Attorney's Office, and provided the unaired footage to the Office on or prior to August 2010, and thus before Scott's trial had commenced. Resp. Mem. at 14. The discussion between ADA Penabad and her supervisor was as follows:

| | |
|---|---|
| ADA: | When [L.R.] starts talking about that . . . she was crying. |
| Supervisor: | Man . . . |
| ADA: | You know, so sad. It's like she was describing a rape but she wasn't saying anything. |
| Supervisor: | Mmm . . . |
| ADA: | So then he asked her, do you know what that is? And she was like no. |
| Supervisor: | She didn't know what it was? |
| ADA: | Like, I don't think she understands the meaning of the word, like she— she was describing how it happened. |
| Supervisor: | But didn't know that that was rape? |
| ADA: | Nnn . . . yeah. |
| Supervisor: | And how old is she? |
| ADA: | Well now she's 20, but she was 19 at the time. But she's slow, you know? |
| Supervisor: | Yeah, no. I mean . . . odd, but . . . |
| ADA: | And he, yeah, and he gave me input on the family, so . . . |
| Supervisor: | Oh, that was good. |
| ADA: | Yeah, so that's good. |
| Supervisor: | I still think you might need to make an offer on that case. |
| ADA: | Oh, no, yeah. |

| | |
|---|---|
| Supervisor. | Yeah, considering the . . . |
| ADA: | But it's something else, it was like. . . |
| Supervisor: | Considering the grand jury took half an hour. |
| ADA: | Yeah. |
| Supervisor: | And that's not even beyond a reasonable doubt. |
| ADA: | Yeah, it's like is it reasonably likely—we're not sure. |
| Supervisor: | We're . . . we don't know. |
| ADA: | We're not sure. |
| Supervisor: | Did you hear yelling in the grand jury when they were deliberating? |
| ADA: | Oh yeah. |
| Supervisor: | Oh. That's never a good thing . . . |
| ADA: | No, I know. I—it's the longest it ever took for a grand jury . . . I've never had a grand jury take that long. |
| Supervisor: | Welcome to Sex Crimes! |
| ADA: | I was outside. Me and, uhh, Detective Gutierrez were like pacing, we're looking . . . |
| Supervisor: | You know what it is, everybody, people have their own perception of what someone should have done or do or—especially in a relationship situation. |
| ADA: | Yeah. |
| Supervisor: | When two people are in a relationship and the person stays after they say they've been sexually assaulted . . . people are just like, well, why didn't you leave? You know, why did you continue? I mean, and that's a normal reaction— |
| ADA: | Yeah, no . . . |
| Supervisor: | You know, 'cause everyone thinks that, well, if this is happening why would you stay, or why would you have consensual sex with the person after he sexually assaulted you? |
| ADA: | Yeah, no . . . |
| Supervisor: | I mean, it makes perfect sense that people would think that. We know it happens because we're prosecutors, but, we know that it's also a hard sell to a jury, you know? |
| ADA: | Yeah. |
| Supervisor: | And when you have a grand jury taking a half hour . . . it's like ughh! You know you're gonna probably . . . |
| ADA: | I know. |
| Supervisor: | . . . get a hung jury at trial and or acquittal.[5] |

---

[5] This transcript was set forth in the People's Appellate Division Brief. SR. at 371-72. The Court directed that respondent submit a copy of the footage to the Court, Dkt. No. 37, which he did. Respondent also sent a copy to Scott, but, according to Scott, he was not permitted to view or keep the footage. Dkt. No. 38.

## 2. Aggravated Harassment Statute Held Unconstitutional

On May 13, 2014, the aggravated harassment statute under which Scott was convicted, New York Penal Law § 240.30(1)(a), was held to be unconstitutionally vague and overbroad by the New York Court of Appeals. *People v. Golb*, 23 N.Y.3d 455, 467-8 (2014) (finding statute unconstitutional under both state and federal constitutions and vacating conviction).

## 3. Section 440.10 Motion

Scott, through different counsel than had represented him at trial, moved to set aside the verdict pursuant to New York Criminal Procedure Law § 440.10 on the grounds that, by suppressing the HBO footage, the prosecution had violated his due process rights under, *inter alia*, the Fourteenth Amendment of the U.S. Constitution and *Brady v. Maryland*, 373 U.S. 83 (1963). SR. at 88. On January 9, 2014, New York Supreme Court Justice Abraham Clott denied the motion on the ground that "nothing in the tape at issue here is exculpatory or impeaching and it could not have led to the discovery of any evidence not otherwise known to the defense." *Id.* at 234. Scott filed for leave to appeal his *Brady* claim with the Appellate Division, First Department. *Id.* at 236. Scott was granted leave to appeal, and the claim was consolidated with his direct appeal. *Id.* at 262.

## 4. Direct Appeal

Scott, represented by counsel, appealed his conviction to the Appellate Division, First Department. *Id.* at 263. On direct appeal, Scott argued: (1) the prosecution suppressed exculpatory footage during Scott's trial, violating his due

process rights under the state and federal constitutions; (2) the court violated Scott's right to present a defense by disallowing the admission of the controlled call from L.R. to Scott, which bore indicia of reliability; (3) the verdict was against the weight of the evidence where the sole eyewitness was incredible; (4) Scott's aggravated harassment convictions must be reversed and dismissed because the statute under which he was convicted had been held to be unconstitutional; (5) his sentence should be reduced because it involved a substantial trial penalty and was not consonant with mitigating facts. *Id.* at 264-65. On March 31, 2015, the First Department unanimously affirmed Scott's conviction. *People v. Scott*, 126 A.D.3d 645 (1st Dep't 2015); SR. at 431-34.

Scott, represented by counsel, sought leave to appeal to the New York Court of Appeals. In his leave application, Scott asked the Court of Appeals to review all of the issues in his appellate brief, including the federal constitutional issues contained therein. SR. at 435. On June 12, 2015, the Court of Appeals denied Scott's leave application. *People v. Scott*, 25 N.Y.3d 1171 (2015); SR. at 449.

## D. This Proceeding

On March 30, 2016, Scott, proceeding *pro se*, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petition for Writ of Habeas Corpus, dated March 30, 2016, Dkt. No. 1. On April 15, 2016, Scott filed an amended petition. Petition for Writ of Habeas Corpus, dated April 15, 2016, Dkt. No. 4. On April 27, 2016, Scott filed a handwritten, second amended petition, which included as exhibits briefs that had been filed on Scott's behalf in state court. Petition for

Writ of Habeas Corpus, dated April 27, 2016, Dkt. No. 8. On June 16, 2016, Judge Failla referred the proceeding to the undersigned for a report and recommendation. Dkt. No. 12.

Upon inquiry from the Court following respondent's motion for a more definite statement, Dkt. No. 14, Scott indicated in correspondence to the Court that he sought to present all of the claims he had raised in his direct appeal. Letter, dated August 9, 2016, Dkt. No. 17; Letter, dated August 23, 2016, Dkt. No. 19; Letter, dated August 19, 2016, Dkt. No. 20.[6] Respondent filed opposition papers on November 18, 2016. Dkt. Nos. 30-31.

## II. DISCUSSION

## A. Legal Standards for Habeas Relief Under Section 2254

### 1. Exhaustion Doctrine

Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may not grant habeas relief unless the petitioner has first exhausted his claims in state court. *See* 28 U.S.C. § 2254(b)(1) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that— (A) the applicant has exhausted the remedies available in the courts of the State; or (B)(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the

---

[6] Respondent subsequently withdrew his motion for a more definite statement following the submission of these letters. Dkt. Nos. 22-23.

applicant."); *see also* 28 U.S.C. § 2254(c) ("An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented."); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). The exhaustion requirement is grounded in principles of comity and federalism. *O'Sullivan*, 526 U.S. at 844 ("Comity thus dictates that when a prisoner alleges that his continued confinement for a state court conviction violates federal law, the state courts should have the first opportunity to review this claim and provide any necessary relief.").

Exhaustion "requires that the prisoner 'fairly present' his constitutional claim to the state courts, which he accomplishes 'by presenting the essential factual and legal premises of his federal constitutional claim to the highest state court capable of reviewing it.'" *Jackson v. Conway*, 763 F.3d 115, 133 (2d Cir. 2014) (quoting *Rosa v. McCray*, 396 F.3d 210, 217 (2d Cir. 2005)). "While 'a state prisoner is not required to cite chapter and verse of the Constitution in order to satisfy this requirement,' he must tender his claim 'in terms that are likely to alert the state courts to the claim's federal nature.'" *Id.* (quoting *Carvajal v. Artus*, 633 F.3d 95, 104 (2d Cir. 2011)). A petitioner may sufficiently alert the state court to the nature of his constitutional claim by citing to a specific constitutional provision. *See Quinones v. Ercole*, 310 F. App'x 434, 436 (2d Cir. 2009). However, a petitioner may

14

not merely "make a general appeal to a constitutional guarantee as broad as due process to present the substance of such a claim to a state court." *Gray v. Netherland*, 518 U.S. 152, 163 (1996).

## 2. Procedural Bar to Claims Deemed Exhausted

Under "the doctrine of procedural default, . . . a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule." *Martinez v. Ryan*, 566 U.S. 1, 9 (2012) (citing *Coleman v. Thompson*, 501 U.S. 722, 747-48 (1991)). If a petitioner has failed to raise a particular claim in state court and would be precluded from doing so now because of a state procedural rule, the federal court "'must deem the claim procedurally defaulted.'" *Jones v. Murphy*, 694 F.3d 225, 247 (2d Cir. 2012) (quoting *Carvajal*, 633 F.3d at 104). Under these circumstances, the claim meets the technical requirements for exhaustion because state remedies are no longer "available" to the petitioner. *Coleman*, 501 U.S. at 732 (citing 28 U.S.C. § 2254(b)).

### a. Independent and Adequate State Grounds for Procedural Bar

When a petitioner "fails to raise his federal claims in compliance with relevant state procedural rules, the state court's refusal to adjudicate the claim ordinarily qualifies as an independent and adequate state ground for denying federal review." *Cone v. Bell*, 556 U.S. 449, 465 (2009) (citing *Coleman*, 501 U.S. at 731). A state court's reliance on the state procedural rule must be "clear from the face of the opinion" in order for it to qualify as an independent state law ground

that would foreclose federal habeas review. *Coleman*, 501 U.S. at 735 (citation omitted). A state law ground is "only adequate to support the judgment and foreclose review of a federal claim if it is 'firmly established and regularly followed' in the state." *Garvey*, 485 F.3d 709, 713 (2d Cir. 2007) (quoting *Lee v. Kemna*, 534 U.S. 362, 376 (2002)).

However, even when the state law ground is firmly established and regularly followed, there are "exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question." *Lee*, 534 U.S. at 376. The Supreme Court has outlined three factors that courts must consider in determining whether a state court's application of a firmly established and regularly followed state procedural rule is "exorbitant." *Id.* at 381. These considerations, though not dispositive for determining adequacy, serve as guidelines in evaluating "'the state interest in a procedural rule against the circumstances of a particular case.'" *Garvey*, 485 F.3d at 714 (quoting *Lee*, 534 U.S. at 381). As adopted and summarized by the Second Circuit, the factors a court must consider include:

> (1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had "substantially complied" with the rule given "the realities of trial," and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest.

*Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir. 2003) (quoting *Lee*, 534 U.S. at 381-85).

In New York, the "contemporaneous objection rule" generally permits state appellate courts to "review only those errors of law that are presented at a time and in a manner that reasonably prompted a judge to correct them during criminal proceedings." *Downs v. Lape*, 657 F.3d 97, 103 (2d Cir. 2011); *see also* N.Y. Crim. Proc. Law § 470.05(2).

### b. Exceptions to Procedural Bar

When a federal habeas court deems such claims exhausted by virtue of the procedural default, the court cannot reach the merits of the claims "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.

To demonstrate cause, a petitioner must demonstrate that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *see also Gutierrez v. Smith*, 702 F.3d 103, 111-12 (2d Cir. 2012). "A petitioner suffers actual prejudice if the outcome of the case would likely have been different absent the alleged constitutional violation." *Collins v. Artus*, No. 08-CV-1936 (PKC) (JCF), 2009 WL 2633636, at *8 (S.D.N.Y. Aug. 26, 2009) (citing *Reed v. Ross*, 468 U.S. 1, 12 (1984)).

Absent a demonstration of cause and prejudice, a petitioner is entitled to habeas review only if he can demonstrate that denying review would result in a "fundamental miscarriage of justice." *Murray*, 477 U.S. at 495–96. A court may

only grant such relief in an "extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Id.* at 496. To be credible, a claim of actual innocence must be supported by "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). Actual innocence "'means factual innocence, not mere legal insufficiency.'" *Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002) (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)).

### 3. Standards of Review Under AEDPA

Under AEDPA, courts may only grant a habeas petition if the challenged state-court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time of the state court decision or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2).

"A state court decision is 'contrary to . . . clearly established Federal law, as determined by the Supreme Court' when 'the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts.'" *Carmichael v. Chappius*, 848 F.3d 536, 544 (2d Cir. 2017) (quoting *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000)); *see also Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012) (circuit precedent, even if "merely

reflect[ing]" Supreme Court precedent, does not constitute "clearly established federal law" for purposes of § 2254(d)(1)).

A state court makes an unreasonable application of federal law if it "correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." *White v. Woodall*, 134 S. Ct. 1697, 1706 (2014). Such application of federal law must be "'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." *Id.* at 1702 (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003)).

AEDPA "'imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt.'" *Jones*, 694 F.3d at 234 (quoting *Hardy v. Cross*, 132 S. Ct. 490, 491 (2011)). The standard "'is difficult to meet,'" and it was intended to be. *Metrish v. Lancaster*, 133 S. Ct. 1781, 1786 (2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011) ("If this standard is difficult to meet, that is because it was meant to be.")).

### 4. *Pro se* Status

Scott bears the burden to establish, by a preponderance of the evidence, that his constitutional rights have been violated. *See, e.g.*, *Cardoza v. Rock*, 731 F.3d 169, 178 (2d Cir. 2013). However, because he is proceeding *pro se*, Scott's submissions are held to less stringent standards than formal pleadings drafted by lawyers. *See, e.g.*, *Davis v. Walsh*, No. 08-CV-4659 (PKC), 2015 WL 1809048, at *1 n.1 (E.D.N.Y. Apr. 21, 2015). Courts must liberally construe a "*pro se* petition 'to raise the strongest arguments' it suggests." *Id.* (quoting *Triestman v. Fed. Bureau*

*of Prisons*, 470 F.3d 471, 472 (2d Cir. 2006)). *Pro se* status, however, "does not exempt a party from compliance with relevant rules of procedural and substantive law." *Triestman*, 470 F.3d at 477 (internal quotation marks omitted).

## B. Analysis

### 1. Two of Scott's Claims are Procedurally Barred

As explained below, the First Department relied on an adequate and independent state ground, New York's contemporaneous objection rule, to deny Scott's *Golb* claim and his claim that his right to present a defense was violated when he was not allowed to present statements from the controlled call. The First Department's application of the rule was not exorbitant as to either claim. Federal habeas courts cannot review such claims unless petitioners can overcome the procedural bar by demonstrating either cause for the default and resulting prejudice, or a fundamental miscarriage of justice. Scott can do neither. The Court thus concludes that these claims are procedurally barred.

### a. *Golb* Claim is Procedurally Barred

In his direct appeal, Scott claimed that his conviction for aggravated harassment should be reversed and dismissed because the statute under which he was convicted was subsequently held unconstitutional by the New York Court of Appeals in *Golb*. SR. at 334; *Golb*, 23 N.Y.3d at 467-68.

The First Department denied Scott's *Golb* claim on the ground that he "failed to preserve his constitutional challenge" at trial. *Scott*, 126 A.D.3d at 646; SR. at

433. The court explicitly rejected the argument that Scott's conviction should be overturned because the statute had been found unconstitutional:

> The unconstitutionality of a statute is not exempt from the requirement of preservation (*see e.g. People v Dozier*, 52 NY2d 781 [1980]), and the fact that *Golb* is applicable to cases pending on appeal does not relieve defendant of that requirement. Although *Golb* had not yet been decided at the time of defendant's trial, defendant had the same opportunity as the defendant in *Golb* to raise the issue (*see People v Stewart*, 67 AD3d 553, 554, affd 16 NY3d 839 [2011]) . . . .

*Id.* Scott sought leave to appeal with the New York Court of Appeals, and the application was denied. *Id.* at 435, 449.

### i. Independent and Adequate State Law Ground

The First Department explicitly relied on an independent and adequate state ground for its refusal to adjudicate the *Golb* claim. The contemporaneous objection rule, codified at § 470.05 of New York's Criminal Procedure Law, is "purely a matter of state law." *Watkins v. Artus*, No. 08-CV-5891 (RJH) (MHD), 2010 WL 5060861, at *11 (S.D.N.Y. July 22, 2010), *adopted by*, 2010 WL 5060883 (S.D.N.Y. Dec. 8, 2010). The rule "'has been interpreted by New York courts to require, at the very least, that any matter which a party wishes to preserve for appellate review be brought to the attention of the trial court at a time and in a way that gave [it] the opportunity to remedy the problem and thereby avert reversible error.'" *Downs*, 657 F.3d at 103 (quoting *Whitley v. Ercole*, 642 F.3d 278, 286 (2d Cir. 2011)) (internal quotation marks omitted).

It is "clear from the face of the opinion" that the state court relied on an independent state law ground that would foreclose federal habeas review. *Coleman*,

21

501 U.S. at 735. The First Department, in holding that Scott "failed to preserve" his constitutional claim, *Scott*, 126 A.D.3d at 646; SR. at 433, clearly and expressly indicated that the lack of a contemporaneous objection was an independent ground for its judgment. *See, e.g., Harris v. Reed*, 489 U.S. 255, 263 (1989) ("procedural default does not bar consideration of a federal claim . . . unless the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar") (internal quotation marks omitted); *see also Person v. Ercole*, No. 08-CV-7532 (LAP) (DF), 2015 WL 4393070, at *18 (S.D.N.Y. July 16, 2015) ("As the Appellate Division's reliance on the state-law preservation requirement was evident from the face of the court's decision, that decision demonstrates that the court relied on an 'independent' state-law ground for rejecting Petitioner's claim.").

"When the state court's decision rests on an independent procedural bar . . . a federal court must still determine whether that state procedural ground is adequate to support the judgment." *Jimenez v. Walker* 458 F.3d 130, 138 (2d Cir. 2006). The Second Circuit has "held repeatedly" that New York's preservation requirement is a "firmly established and regularly followed" state procedural rule. *Downs*, 657 F.3d at 104 (citing *Whitley*, 642 F.3d at 286-87; *Richardson v. Greene*, 497 F.3d 212, 219 (2d Cir. 2007); *Garvey*, 485 F.3d at 718; *Taylor v. Harris*, 640 F.2d 1, 2 (2d Cir. 1981) (per curiam)).

The Court must next consider whether this is an "exceptional" case in which "exorbitant application of a generally sound rule renders the state ground

inadequate to stop consideration of a federal question." *Lee*, 534 U.S. at 376. Under an analysis of the *Cotto* factors, the Court finds the First Department's application of the rule was not exorbitant.

As a preliminary matter, the first consideration under *Cotto*—whether the trial court "actually relied on" the procedural default—is "less applicable in this case because the lack of a contemporaneous objection would not, almost by definition, be mentioned by the trial court." *Cotto*, 331 F.3d at 242; *see also, e.g., Kozlowski v. Hulihan*, 511 F. App'x 21, 26 (2d Cir. 2013) ("[W]e are not now in a position to opine on what that court might have done in the hypothetical circumstance that petitioners had advanced their constitutional argument.")

The second *Cotto* factor—whether New York law requires compliance with the rule under the circumstances presented—weighs in favor of finding the state court's decision adequate. New York courts consistently require compliance with the contemporaneous objection rule to preserve an objection to the constitutionality of a statute. *People v. Dozier*, 52 N.Y.2d 781, 783 (1980) ("with respect to the other claims of unconstitutionality . . . namely, the contention that the statute unconstitutionally discriminates . . . [t]hose issues were not properly raised in the trial court and thus are beyond our review"); *People v. Beaumont*, 299 A.D.2d 657, 658–59 (3d Dep't 2002) (refusing to review constitutional challenge to statute that was "unpreserved for our review, since it was not raised before the trial court"); *People v. Harris*, 288 A.D.2d 610, 618 (3d Dep't 2002) (refusing to review

constitutional challenge to sentencing statute that was "not raised at the time of sentencing and [was] not preserved").

Specifically, since New York's aggravated harassment statute was held unconstitutionally vague and overbroad in May of 2014, New York courts have applied the contemporaneous objection rule to deny review of claims challenging conviction under the statute (and other similar statutes) in cases where the constitutional challenge was not preserved at trial. *See, e.g.*, *People v. Irizarry*, 135 A.D.3d 641, 642 (1st Dep't 2016) ("Defendant has failed to preserve his challenge to his aggravated harassment conviction under former Penal Law § 240.30(1)(a), and we adhere to our prior determinations that preservation is required in defendant's situation."), *appeal denied*, 28 N.Y.3d 931 (2016); *People v. Murphy*, 132 A.D.3d 550, 551 (1st Dep't 2015) ("Defendant did not preserve his challenge to the constitutionality of Penal Law § 215.51(b)(iv) . . . notwithstanding that he cites *People v. Golb* . . . . Defendant's argument to the contrary improperly conflates the issue of preservation with the principle of retroactivity to pending cases."), *appeal denied*, 26 N.Y.3d 1091 (2015); *cf. People v. Westwood*, 41 N.Y.S.3d 347, 350 (2d Dep't 2016) (vacating conviction for aggravated harassment on grounds that, "[a]s the People concede, Penal Law § 240.30(1) has been declared unconstitutional, a determination that is given retroactive effect where, as here, the constitutional claim has been properly preserved"), *appeal denied*, 28 N.Y.3d 1127 (2016).

Finally, the third consideration under *Cotto*—whether Scott, in fact, sufficiently complied with the rule in light of the realities of trial—also weighs in

favor of finding adequacy. On direct appeal, Scott did not contend that his counsel objected to the constitutionality of the statute during the course of the trial. Indeed, Scott concedes in his appellate reply brief that no objection was made, comparing his situation to that of another defendant, who "could not have preserved his argument that the Supreme Court's decision striking down the statute required that his conviction be vacated." SR. at 427.

### ii. No Cause and Prejudice, or Fundamental Miscarriage of Justice

Scott can overcome the procedural bar to the Court's review of these claims only if he can "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. Having asserted in his petition exactly the claims made on direct appeal, Scott has not made an explicit argument regarding cause and prejudice, which would not have been germane on direct appeal. However, applying the less stringent standards to which courts hold *pro se* litigants, the Court will construe the assertion made on direct appeal regarding the inapplicability of the contemporaneous objection rule as a basis for the failure to preserve the constitutional challenge. *See, e.g.*, *Walker v. Ercole*, No. 08-CV-4204 (DLI) (JMA), 2011 WL 843966, at *8 (E.D.N.Y. Mar. 8, 2011) ("Petitioner does not argue that the change in the law is the cause for the procedural default of his jury instruction claim. However, because Petitioner is *pro se*, the court will construe Petitioner's brief as asserting this argument with regard to this claim."); *Holguin v. Lee*, No. 13-CV-1492 (LGS) (JLC),

25

2014 WL 5508331, at *12 (S.D.N.Y. Oct. 31, 2014) (construing "claims for ineffective assistance of trial counsel . . . and the prosecutor's summation as assertions of cause for the failure to preserve these arguments"), *adopted by*, 2016 WL 1030129 (S.D.N.Y. Mar. 10, 2016).

"[T]he cause requirement is met if some objective factor, external to Petitioner's defense, interfered with his ability to comply with the state's procedural rule." *Gutierrez*, 702 F.3d at 111 (citing *McCleskey v. Zant*, 499 U.S. 467, 493 (1991); *see also Murray*, 477 U.S. at 488. "An example of such an objective impediment is a 'showing that the factual or legal basis for a claim was not reasonably available to counsel at the time of trial." *Gutierrez*, 702 F.3d at 111, (quoting *Strickler v. Greene*, 527 U.S. 263, 283 n.24 (1999)). "[W]here a constitutional claim is so novel that its legal basis is not reasonably available to counsel, a defendant has cause for his failure to raise the claim in accordance with applicable state procedures." *Reed v. Ross*, 468 U.S. 1, 16 (1984). But, "[w]here the basis of a constitutional claim is available, and other defense counsel have perceived and litigated that claim, the demands of comity and finality counsel against labeling alleged unawareness of the objection as cause for a procedural default." *Engle v. Isaac*, 456 U.S. 107, 134 (1982); *see also United States v. Thorn*, 659 F.3d 227, 233 (2d Cir. 2011).

Alternatively, "futility may constitute cause 'where prior state case law has consistently rejected a particular constitutional claim.'" *Gutierrez*, 702 F.3d at 111-12 (quoting *DiSimone v. Phillips*, 461 F.3d 181, 191 (2d Cir. 2006)). "But, 'futility

26

cannot constitute cause if it means simply that a claim was unacceptable to that particular court at that particular time.'" *Id.* (quoting *Bousley*, 523 U.S. at 623).

Eight years prior to Scott's trial, a federal judge discussing New York's aggravated harassment statute observed, "for nearly half of its thirty year history, the statute's constitutionality has been questioned." *Vives v. City of N.Y.*, 305 F. Supp. 2d 289, 300 (S.D.N.Y. 2003) *rev'd on other grounds*, 405 F.3d 115 (2d Cir. 2005). At the time of Scott's trial, the statute had been challenged on constitutional grounds in federal court and "[t]hree federal judges had already found this statute unconstitutional." *Golb*, 23 N.Y.3d at 467 (citing *Vives*, 305 F. Supp. 2d at 299; *Vives*, 405 F.3d at 123-24 (Cardamone, J., dissenting in part, concurring in part); *Schlagler v. Phillips*, 985 F. Supp. 419, 421 (S.D.N.Y. 1997), *rev'd on other grounds*, 166 F.3d 439 (2d Cir. 1999)).

The aggravated harassment statute had also been challenged in state court prior to Scott's trial. New York courts had found the statute unconstitutional as applied. *See, e.g., People v. Dupont*, 107 A.D.2d 247, 256 (1st Dep't 1985) (240.30 unconstitutional as applied); *People v. Pierre-Louis*, 927 N.Y.S.2d 592, 597 (Dist. Ct. 2011) (same). In 2003, the New York Court of Appeals considered a constitutional challenge to the statute, and, while not explicitly reaching the constitutionality issue, stated: "We cannot agree with the People's argument that appellant's messages fall within any of the proscribable classes of speech or conduct." *People v. Mangano*, 100 N.Y.2d 569, 571 (2003). In 1989, the New York Court of Appeals

found a similarly-worded penal law unconstitutional. *People v. Dietze*, 75 N.Y.2d 47, 51 (1989).

Scott's *Golb* claim was therefore not novel enough to excuse default because the "basis of a constitutional claim [was] available, and other defense counsel [had] perceived and litigated that claim." *Engle*, 456 U.S. at 134; *see also Roman v. Abrams*, 822 F.2d 214, 223 (2d Cir. 1987) (finding constitutional claim was not novel where, *inter alia*, majority of New York Court of Appeals had recently rejected claim, but three dissenting judges had accepted it and New York had urged Supreme Court to grant petition for certiorari in case presenting claim, noting that question was "significant and recurring").

Based on the foregoing history of constitutional challenges to the statute, a number of which were successful, futility cannot constitute cause because prior state case law had not "'consistently rejected a particular constitutional claim.'" *Gutierrez*, 702 F.3d at 111-12 (quoting *DiSimone*, 461 F.3d at 191).

Because Scott has not demonstrated cause for his procedural default, the Court need not address the issue of prejudice. *See, e.g.*, *McCleskey*, 499 U.S. at 502. Finally, Scott has failed to demonstrate that this Court's failure to consider this claim would constitute a fundamental miscarriage of justice, which occurs only in those "extraordinary instances when a constitutional violation probably has caused the conviction of one innocent." *Id.* at 494. Nowhere in Scott's main appellate brief or reply does he contend that he is actually innocent.

## b. Right to Present a Defense Claim is Procedurally Barred

On direct appeal, Scott raised a due process claim that the court violated his right to present a defense by disallowing admission of an exculpatory statement made during L.R.'s controlled call to Scott on October 30. SR. at 322-23.

The First Department applied New York's contemporaneous objection rule and rejected Scott's claim on the ground that he failed to preserve the claim at trial: "[Scott]'s claim that the court should have admitted a recording containing his own exculpatory statement is unpreserved and expressly waived, and we decline to review it in the interest of justice." *Scott*, 126 A.D.3d at 646; SR. at 433. Scott sought leave to appeal with the New York Court of Appeals, and the application was denied. SR. at 435, 449.

### i. Factual Background

During L.R.'s cross-examination, Scott's counsel sought to elicit statements made by Scott during the controlled call. TR. at 192-98. The next day, prior to the testimony of Detective Gutierrez, counsel revisited the issue. *Id.* at 314-30. As discussed below, nothing in the trial record demonstrates that Scott's counsel argued, during the trial, that disallowing the statements would violate Scott's constitutional right to present a defense.

### a. L.R.'s Cross-examination

During L.R.'s cross-examination, Scott's counsel asked: "[d]o you remember a point in the conversation where Andre Scott asks you—" and the prosecutor objected, arguing that if the defendant wanted to talk about what he said, he would

need to testify. TR. at 192. Scott's counsel and the prosecutor engaged back and forth on the admissibility of these statements. Scott's counsel replied: "It's an effect on the listening [sic], we're talking about a conversation that was recorded by the police here, that this woman on the stand is going to testify to. Det. Guitierez [sic] is going to testify too. It's going to come out." *Id.* at 192. The judge responded: "[i]t may come out but you have to do it according to the rules." Scott's counsel then moved on, posing a new question to L.R. *Id.* at 192.

Subsequently, defense counsel began a question: "Okay, when you were discussing what happened between the two of you—," and the prosecutor objected, arguing that, "[n]othing the defendant said can come in here." *Id.* at 193. Scott's counsel replied that the call was "a recorded telephone call by a special victim's detective feeding this woman information trying to entrap my client," and "extremely valuable information." *Id.* at 193-94. The prosecutor countered that the statements were "basically hearsay." *Id.* at 194. Scott's counsel replied: "I'm not trying to get the statement in," and that his position was that "the police are trying to extract these statements from the defendant by tutoring the witness, asking her to ask questions." *Id.* at 194. After further discussion, Scott's counsel said: "when the detective gets up there she's going to say . . . we tried to do this. I am going to the detective, you did this controlled call because you wanted to get evidence of rape against Andre Scott; yes or no? And she's going to say yes." *Id.* at 198.

Following this colloquy, Scott's counsel abandoned the effort to pursue this line of questioning. The trial judge had not ruled on the issue, but she did indicate that she was skeptical that the statements were admissible:

Prosecutor: [T]he most basic tenant [sic] of a party admission exclusion of hearsay is that it's offered by the person opposing the person who said it.

The Court: I don't see—

Scott's Counsel: I'll move on Judge.

The Court: I don't see it being admissible.

Scott's Counsel: I'll move on. Just give me a few moments I should be done momentarily.

*Id.* at 198-99.

### b. Detective Gutierrez's Testimony

The parties had another exchange about the call the next day, prior to the testimony of Detective Gutierrez. *Id.* at 314-30. Scott's counsel stated that the call was relevant, that he had tried to get a line of content from the call into evidence the day before, that he did not have Detective Gutierrez's notes from the call, and that he would have to "look at these notes first when I get them . . . but if [the prosecution does not] have these notes . . . you know, I may make an argument." *Id.* at 314-15. Following further discussion, the trial judge said: "[t]he bottom line is that you are entitled to a legible copy and when you read it, you are going to decide whether to make applications to me," to which defense counsel replied "100 percent." *Id.* at 319. Following a recess, the prosecutor put on the record that he had turned over Detective Gutierrez's handwritten notes from the call. *Id.* at 320. Defense counsel then said that he was "not that far in disagreement" with the prosecution, and that he "should be able to ask the detective about the call, not the

31

content, but about it and how it was—how it came about and how it was orchestrated for a couple of reasons." *Id.* at 323. Scott's counsel explained further that, had he not been provided with the notes, "<u>my application to your Honor would have been to let some of the substance in</u>." *Id.* at 323 (emphasis added).

## ii. Independent and Adequate State Law Ground

The First Department relied on an independent and adequate state law ground to reject Scott's claim that his right to present a defense had been violated because his statements from the controlled call were not admitted. As discussed above, New York's contemporaneous objection rule is "purely a matter of state law." *Watkins*, 2010 WL 5060861, at *11. It is "clear from the face of the opinion," *Coleman*, 501 U.S. at 735, that the state court relied on an independent state law, because the First Department, in finding that Scott's claim was "unpreserved and expressly waived," clearly and expressly indicated that the lack of a contemporaneous objection was an independent, state law ground for its judgment. *Scott*, 126 A.D.3d at 646; SR. at 433; *Harris*, 489 U.S. at 263 (state judgment must clearly and expressly provide that judgment rests on state procedural bar). The state law ground is also adequate: as discussed above, the Second Circuit has "held repeatedly" that New York's preservation requirement is a "firmly established and regularly followed" state procedural rule. *Downs*, 657 F.3d at 104.

Under the *Cotto* factors, the Court finds the application of the rule as to this issue was also not exorbitant. As noted above, the first consideration under *Cotto*—whether the trial court "actually relied on" the procedural default—is "less

applicable in this case because the lack of a contemporaneous objection would not, almost by definition, be mentioned by the trial court." 331 F.3d at 242; *see, e.g.,* *Kozlowski*, 511 F. App'x at 26.

The second *Cotto* factor—whether New York law requires compliance with the rule under the circumstances presented—weighs in favor of finding the state court's application not to be exorbitant. New York courts require that an objection to an evidentiary ruling specify the constitutional grounds on which it is based in order to preserve the constitutional challenge. *See, e.g., People v. Angelo*, 88 N.Y.2d 217, 222 (1996) (where defendant objected at trial to ruling prohibiting testimony on certain topic but did not raise claim that ruling violated constitutional rights to due process until appellate review, "[b]ecause defendant failed to present these constitutional claims to County Court . . . they are unpreserved for this Court's review"); *People v. Mack*, 14 A.D.3d 517, 517 (2d Dep't 2005) ("Although the defendant objected to that testimony and moved for a mistrial, he did not specify the ground now raised on appeal and failed to object to the court's remedy. Therefore, the issue is unpreserved for appellate review."). Further, there are no "unique circumstances" in this case that would excuse compliance. *Garvey*, 485 F.3d at 719 (citing *Lee*, 534 U.S. at 382).

Finally, the third consideration under *Cotto*—whether Scott, in fact, sufficiently complied with the rule in light of the realities of trial—also weighs in favor of finding the application not to be exorbitant. Scott did not contend on direct appeal that his counsel explicitly raised a due process objection at trial, but rather

claimed that counsel preserved that argument when he "proffered the evidence . . . and asked that it be introduced in the interest of justice." SR. at 326. There is nothing in the record, however, to indicate that Scott's counsel made an argument that disallowing the statement would violate Scott's right to present a defense. During the cross-examination of L.R., Scott's counsel elected to "move on" without seeking a ruling on the issue and, prior to the testimony of Detective Gutierrez but after receiving the detective's notes, Scott's counsel explicitly disclaimed efforts to enter Scott's statements from the call into evidence. TR. at 198, 323.

"[T]he New York Court of Appeals has long rejected invitations to review constitutional arguments purportedly raised implicitly in the trial court." *Wright v. Duncan*, 500 F. App'x 36, 38 (2d Cir. 2012) (citing *Angelo*, 88 N.Y.2d at 222) (due process claims unpreserved for appellate review where they were not presented to trial court along with evidentiary objections). In New York, in order to "preserve a claim of error in the admission of evidence at trial . . . a defendant must make his or her position known to the court," and a "general objection is not sufficient to preserve an issue since such would not alert the court to defendant's position." *Garvey*, 485 F.3d at 714 (citing *People v. Gray*, 86 N.Y.2d 10, 20 (1995)). In *Wright*, the petitioner argued that the trial court should have understood that he was raising a constitutional objection to an evidentiary ruling excluding a hearsay statement because he raised an evidentiary objection and used the word "unfair." *Wright*, 500 F. App'x at 38. The Second Circuit disagreed, and noted that the rule "serves (1) to ensure that parties draw [a] trial court's attention to any potential

34

error while there is still opportunity to address it, and (2) to prevent parties from 'sandbagging' opposing party and trial court on appeal." *Wright*, 500 F. App'x at 38 (citing *Whitley*, 642 F.3d at 288).

Scott's trial counsel neither made an explicit constitutional argument about the admissibility of the statement, nor sought a ruling on the prosecutor's evidentiary objection to defense counsel's attempt to elicit statements from the call during L.R.'s cross-examination. Instead, counsel abandoned his attempt and offered to "move on." TR. at 198. He also did not make an explicit constitutional argument regarding the admissibility of Scott's statement during Detective Gutierrez's testimony. In fact, after receiving the notes, Scott's counsel said that had he not been able to see the notes, he "would have" made an "application" to get the "substance" of the call in. *Id.* at 323. As the First Department observed: "[t]o the extent that defendant sought admission of the statement, he abandoned that request and accepted a different remedy offered by the court." *Scott*, 126 A.D.3d at 646; SR. at 433.

In sum, Scott's claim is procedurally barred because the First Department's refusal to adjudicate the claim qualifies as an independent and adequate state ground, and the application of the contemporaneous objection rule was not exorbitant.

### iii. No Cause and Prejudice, or Fundamental Miscarriage of Justice

Scott may overcome the procedural bar to the Court's review of this claim only by demonstrating either cause for default and actual prejudice, or that the

failure to consider the claim will result in a fundamental miscarriage of justice. *See Coleman*, 501 U.S. at 749-50. On direct appeal, Scott did not allege any cause for his counsel's having failed to make his position—that disallowing the statements would violate Scott's right to present a defense—known to the court. Given that Scott has not demonstrated cause, the Court need not address the issue of prejudice. *See, e.g., McCleskey*, 499 U.S. at 502.

Similarly, Scott has not demonstrated that this Court's failure to consider his claim would constitute a fundamental miscarriage of justice, which occurs only in those "extraordinary instances when a constitutional violation probably has caused the conviction of one innocent." *See id.* at 494. Specifically, Scott has not demonstrated that he is actually innocent with any "new reliable evidence . . . that was not presented at trial." *Schlup*, 513 U.S. at 324.

\*\*\*

In conclusion, the First Department's refusal to adjudicate Scott's claims regarding the now-unconstitutional aggravated harassment statute and the admission of the controlled call was based on an independent state law ground and in accord with firmly established and regularly followed New York state law. Scott has not overcome the procedural bar by demonstrating cause and prejudice or a fundamental miscarriage of justice for either claim. The Court therefore need not reach the merits of these claims. *See Whitley*, 642 F.3d at 292.

## 2. Two of Scott's Claims, While Exhausted, Are Without Merit

### a. The State Court's Rejection of Scott's *Brady* Claim Was Not Objectively Unreasonable

Scott moved to set aside the verdict pursuant to New York Criminal Procedure Law § 440.10 on the ground that, by suppressing the HBO footage, the prosecution had violated his due process rights. SR. at 88. The trial court denied the motion, and Scott filed for and was granted leave to appeal the claim to the First Department. SR. 234, 236, 262.

On direct appeal, Scott argued that the video was both impeaching and exculpatory, that the prosecution had suppressed the videotape, and that there was a reasonable possibility that the suppressed material, had it been available, would have affected the verdict. SR. at 314-19. Scott contended that the footage was impeaching because, if the prosecutor's statement that L.R. "didn't know that [what Mr. Scott did] was a rape" is credited, then L.R.'s trial testimony cannot be true, and thus the tape bears on her credibility. Specifically, Scott claimed that, "[i]n a case that turned on whether the fact-finder believed her, this information is invaluable." SR. at 315. Scott noted that, in summation, the prosecutor quoted L.R.'s comment that she knew during the alleged assault that she would be "dead or raped." SR. at 425; *see also* TS. at 873. Scott claimed that the footage was exculpatory because the "prosecutor's observation that [L.R.] was susceptible to suggestion would have provided the defense an alternative theory to explain her delayed reporting," which was that "[L.R.'s] relationship with Scott had soured and

... it is possible she understood—or came to understand due to suggestibility—how her accusation of rape would enact [sic] retribution upon him." SR. at 315-16.

The First Department held that the trial court properly denied the § 440.10 motion, finding that "[t]o the extent that these comments could be viewed as a source of impeachment material, we find that there was no reasonable possibility that timely disclosure would have affected the outcome." SR. at 432. The court reasoned that the information was similar to impeachment material that had been available to defendant at trial, and the claim that the footage could have led to significant impeachment was "speculative." SR 432. Scott sought leave to appeal the First Department's decision on the *Brady* claim, arguing that the court had misapplied the materiality standard. SR. at 437. The New York Court of Appeals denied the application and thus the claim was exhausted. SR. at 449. Therefore, the Court will review the *Brady* claim on the merits under AEDPA, analyzing whether the appellate court's rejection of the claim was contrary to or involved an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d)(1).

The "due process principles applicable" to a *Brady* claim are "clearly established." *Fuentes v. Griffin*, 829 F.3d 233, 245 (2d Cir. 2016). The "prosecution has an affirmative duty to disclose evidence favorable to a defendant," and "[t]he contours of the duty have progressively been refined." *Id.* The Supreme Court held in *Brady v. Maryland* that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the

prosecution." *Brady*, 373 U.S. at 87. The duty exists "irrespective of whether the accused made a request." *Fuentes*, 829 F.3d at 246 (citing *United States v. Agurs*, 427 U.S. 97, 107 (1976)). The duty applies not just to evidence that affirmatively exculpates a defendant, but also may include evidence that impeaches the credibility of witnesses. *See United States v. Bagley*, 473 U.S. 667, 676-77 (1985); *Giglio v. United States*, 405 U.S. 150, 154 (1972). "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler*, 527 U.S. at 281-82.

Favorable, suppressed evidence must be "material" in order for its suppression to satisfy the prejudice component. *Banks v. Dretke*, 540 U.S. 668, 698 (2004) ("Unless suppressed evidence is material for *Brady* purposes, [its] suppression [does] not give rise to sufficient prejudice to overcome [a] procedural default.") (internal quotation marks omitted). "Evidence is material" if "'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *United States v. Persico*, 645 F.3d 85, 111 (2d Cir. 2011) (quoting *Strickler*, 527 U.S. at 280; *Kyles v. Whitley*, 514 U.S. 419, 433 (1995)). A defendant "need only show, considering the record as a whole, a 'reasonable probability'—and 'the adjective is important'—of a different result great enough to 'undermine [ ] confidence' that the jury would have found him guilty beyond a reasonable doubt." *Fuentes*, 829 F.3d at 246 (quoting *Kyles*,

514 U.S. at 434) (citation omitted). "However, where the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or is subject to extensive attack by reason of other evidence, the undisclosed evidence may properly be viewed as cumulative, and hence not material, and not worthy of a new trial." *Persico*, 645 F.3d at 111.

As explained below, the First Department's rejection of the *Brady* claim was not objectively unreasonable. Regarding the claim that the footage was exculpatory, it is not objectively unreasonable to conclude that the evidence was not favorable to the defendant. Regarding the claim that the footage could have been used to impeach L.R., it is not objectively unreasonable to conclude that the suppression of the footage did not prejudice Scott, as the footage is highly similar to material that was available to defense counsel at the trial.

### i.  The Footage is Not Exculpatory

The threshold question is whether the footage is "favorable to the accused, either because it is exculpatory, or because it is impeaching." *Strickler*, 527 U.S. at 281-82.  Scott's argument that the video is exculpatory is not borne out by the record.  The prosecutor's comment "[b]ut she's slow" is not, as Scott claimed on appeal, an "observation that [L.R.] was susceptible to suggestion [that] would have provided the defense an alternative theory to explain her delayed reporting."  None of the footage plausibly provides, as Scott claims, "an alternative explanation for the non-reporting that exculpated Scott."  SR. at 315-16.  Given that the footage cannot

40

satisfy the first component of the *Brady* test, the claim that the video was exculpatory will not be considered further.

### ii. The Footage is Not Material for Impeachment Purposes

L.R. testified both on direct and cross-examination that she knew she was being raped while it was happening on August 22. TR. at 44, 131. The HBO footage is evidence that, on October 30, L.R. told Smith that she did not know that what happened on August 22 was rape. SR. at. 371. The footage may thus arguably contain admissible evidence of a prior statement by L.R. inconsistent with her testimony, which could have been used to impeach her at trial. *See, e.g., People v. Bradley*, 99 A.D.3d 934, 936-37 (1st Dep't 2012) ("[A] party may show that an adversary's witness has, on another occasion, made oral or written statements which are inconsistent with some material part of the trial testimony, for the purpose of impeaching the credibility and thereby discrediting the testimony of the witness . . . . Since evidence of inconsistent statements is often collateral to the ultimate issue before the [trier of fact] and bears only upon the credibility of the witness, its admissibility is entrusted to the sound discretion of the Trial Judge.") (internal quotation marks omitted).

The footage was arguably "suppressed by the State, either willfully or inadvertently," satisfying the second component. *Strickler*, 527 U.S. at 282. Scott's trial began on January 10, 2011 and the sentencing hearing occurred on April 14, 2011. The state conceded on direct appeal that HBO provided the footage to the

District Attorney's Office in August 2010 but that the District Attorney's Office did not disclose it to Scott's trial counsel until October 3, 2011. SR. at 372.

However, even if the footage were found to be admissible and impeaching, the conclusion that its suppression was not prejudicial is not objectively unreasonable. Courts have found that, in certain circumstances, it would be objectively unreasonable for a state court to conclude that the suppression of information was not prejudicial. *See, e.g.*, *Fuentes*, 829 F.3d at 252-53 (reversing district court's rejection of petitioner's *Brady* claim where, *inter alia*, suppressed information could have been used to challenge the credibility of a witness whose "testimony was the only evidence that what occurred . . . was a rape rather than a sexual encounter in which she was a willing participant"). However, in this case, as the First Department observed, the "information [in the footage] was similar to impeachment material available to defendant at trial." *Scott*, 126 A.D.3d at 646; SR. at 434. ADA Penabad's notes include the words: "asked her you know what rape is – she said no" and "when discussed forced sex – she cried + had to sit down" and "told her to report it." SR. at 215. These notes were disclosed to defense counsel a day before L.R. testified, and two days before the defense cross-examined L.R. SR. at 164, 190. Under New York state law, this is sufficient for Scott's counsel to have had an opportunity to use the information in the notes to cross-examine and attempt to impeach L.R. *See, e.g.*, *People v. Cortijo*, 70 N.Y.2d 868, 870 (1987) (disclosure of information during trial did not violate right to fair trial where defendant was given "meaningful opportunity to use the allegedly exculpatory material to cross-examine

42

the People's witnesses or as evidence during his case"); *People v. Sanchez*, 21 N.Y.3d 216, 224 (2013) (denying *Brady* violation where evidence was disclosed "on the eve of trial and [defendant] had a reasonable opportunity to use it as part of his defense") (citing *Cortijo*, 70 N.Y.2d at 870); *People v. Sanchez*, 144 A.D.3d 1179, 1180 (2d Dep't 2016) (rejecting claim regarding material disclosed during People's case-in-chief where trial court afforded defendant opportunity to review material and recall relevant witness for cross-examination) (citing *Cortijo*, 70 N.Y.2d at 870); *People v. Nielsen*, 67 A.D.3d 1440, 1440-41 (4th Dep't 2009) (rejecting contention that defendant was denied fair trial based on People's failure to disclose information prior to trial because defendant was "given a meaningful opportunity to use the allegedly exculpatory material to cross-examine People's witnesses or as evidence during [her] case") (citing *Cortijo*, 70 N.Y.2d at 870).

While the HBO footage is arguably evidence that, on October 30, L.R. told Smith she did not know that what had taken place on August 22 was rape, ADA Penabad's notes are also evidence of the same conversation. The footage cannot be "material" unless "'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Persico*, 645 F.3d at 111 (quoting *Strickler*, 527 U.S. at 280; *Kyles*, 514 U.S. at 433). Because the notes and the footage contain such similar information, the footage "merely furnishes an additional basis on which to challenge a witness" and thus cannot be considered material. *Id.* Scott nearly conceded as much in his appellate reply brief where he asserted that, "having access to the even more blatant

suppressed videotape would have served to _further_ undermine the conviction." SR. at 424 (emphasis added). The First Department was thus not objectively unreasonable in finding that "there was no reasonable possibility that the timely disclosure would have affected the outcome," had the footage been disclosed before trial. _Scott_, 126 A.D.3d at 646; SR. at 434. Accordingly, the Court concludes that Scott's _Brady_ claim is without merit.

### b. The State Court's Rejection of Scott's Vindictive Sentencing Claim Was Not Objectively Unreasonable

Scott's claim that the trial court penalized him for going to trial, which would amount to the imposition of a vindictive sentence and a violation of due process rights, should be rejected. There is no indication that his sentence amounted to punishment for proceeding to trial and the First Department's rejection of the claim was not objectively unreasonable.

Scott argued on direct appeal that his sentence should be reduced for a number of reasons. He asserted that he had "received a substantial trial penalty," and that the disparity between his sentence of 20 years incarceration plus 10 years post-release supervision and a pretrial plea offer of five years "suggests he was being penalized for exercising his trial rights." SR. at 334, 336. He also argued that a reduced sentence would be appropriate because the evidence against him was weak and because he had presented mitigating evidence suggesting he was leading a productive life. SR. at 334-37.

The First Department rejected the sentencing claims, finding "no basis for reducing the sentence." _Scott_, 126 A.D.3d at 645; SR. at 434. Scott sought leave to

44

appeal with the New York Court of Appeals and the application was denied, thus exhausting the claim. SR. at 435, 449. The Court will therefore review the vindictive sentencing claim on the merits under AEDPA, looking to whether the appellate court's rejection of the claim was contrary to or involved an unreasonable application of clearly established federal law.

A court may not "vindictive[ly]" sentence a defendant for exercising a constitutional right, such as going to trial instead of accepting a plea bargain. *See North Carolina v. Pearce*, 395 U.S. 711, 725 (1969), *overruled on other grounds*, *Alabama v. Smith*, 490 U.S. 794 (1989). However, a petitioner's post-trial sentence is not unconstitutional simply because it exceeds a plea offer. As the Supreme Court has observed, "plea bargaining flows from the 'mutuality of advantage' to defendants and prosecutors, each with his own reasons for wanting to avoid trial." *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978) (quoting *Brady v. United States*, 397 U.S. 752 (1970)). Though the risk of a more severe punishment may discourage a defendant from going to trial, "the imposition of these difficult choices is an inevitable—and permissible—attribute of any legitimate system which tolerates and encourages the negotiation of pleas." *Bordenkircher*, 434 U.S. at 364 (internal quotation marks omitted). Further, "the mere fact that the sentence imposed following trial is greater than the offer made during plea negotiations, does not indicate that a petitioner has been punished for exercising his right to proceed to trial." *Walker v. Walker*, 259 F. Supp. 2d 221, 226 (E.D.N.Y. 2003); *see also, e.g.*, *Brewster v. New York*, No. 08-CV-4653 (JFB), 2010 WL 92884, at *11 (E.D.N.Y. Jan.

45

6, 2010) ("The mere fact that the trial court, following conviction, imposed a higher sentence than the plea offer does not, in and of itself, establish actual vindictiveness."); *Powell v. Phillips*, No. 05-CV-3537 (DLC), 2009 WL 929538, at *19 (S.D.N.Y. Apr. 7, 2009) ("When a sentence imposed at the conclusion of a trial is greater than the sentence a prosecutor had been willing to recommend as part of a plea offer, the disparity does not, without more, establish vindictiveness.").

On direct appeal, Scott pointed only to the disparity in the plea offer and post-trial sentence to demonstrate that the trial court punished him. Scott did not offer any other evidence of the purported penalty. Indeed, he focused on the other sentencing claims, discussed *infra* in section II.B.3.b, and stated: "We do not argue that the sentence imposed was an abuse of discretion. Rather, we ask this Court to exercise its independent discretion to reduce that sentence." SR. at 335. The "mere fact" that Scott's sentence was greater than the plea offer does not demonstrate that he was punished for proceeding to trial. *Walker*, 259 F. Supp. 2d at 226. Further, prior to imposing the sentence, the trial judge stated her reasoning: "[L.R.] will remain burdened by the memory of what you have done. You have inflicted deep wounds. Although you are entitled to maintain your innocence, your rehabilitation cannot begin until you take full responsibility for your reprehensible behavior." TS. at 37-38.

As the mere length of Scott's sentence, without more, is insufficient to demonstrate that he was punished for going to trial, the First Department's rejection of the vindictive sentencing claim was not an objectively unreasonable

46

application of federal law. The Court thus concludes that Scott's vindictive sentencing claim is without merit.

## 3. Certain of Scott's Claims Are Not Cognizable Under Habeas Review

### a. The Weight of the Evidence Claim is Not Cognizable

#### i. Weight of the Evidence Claim

Scott contended on direct appeal that his convictions stemming from the night of August 22, 2009 were against the weight of the evidence because the sole eyewitness, L.R., was not credible.[7] *Id.* at 327. He asserted that because L.R.'s testimony was uncorroborated and substantially contradicted, and she was the sole eyewitness, the verdict was against the weight of the evidence and must be reversed. *Id.* at 327. The First Department evaluated this claim and found that "[t]he verdict was not against the weight of the evidence," observing that there was "no basis for disturbing the court's credibility determinations, including its evaluation of the victim's delay in reporting the rape and any inconsistencies in her testimony." *Scott*, 126 A.D.3d at 645; SR. at 431-32. Scott sought leave to raise the issue in his application for permission to appeal to the Court of Appeals, which was denied. SR. at 435, 449.

A weight of the evidence claim is exclusively a matter of state law and therefore presents no federal question reviewable by a federal habeas court. *See,*

---

[7] The Court notes that Scott's appellate brief lists the Fourteenth Amendment in the heading to "Point III," the section of the brief presenting the weight of the evidence claim. However, the entire section is dedicated to a weight of the evidence claim, and at no point does it raise a legal sufficiency claim. SR. at 327-34.

*e.g., McKinnon v. Superintendent, Great Meadow Corr. Facility*, 422 F. App'x 69, 75 (2d Cir. 2011) ("[T]he argument that a verdict is against the weight of the evidence states a claim under state law, which is not cognizable on habeas corpus.");

*Quintana v. Lee*, No. 12-CV-3204 (PGG) (FM), 2014 WL 6749207, at *6 (S.D.N.Y. Nov. 18, 2014) (petitioner's weight of the evidence claim not cognizable on habeas review), *adopted by*, 2016 WL 2755918 (S.D.N.Y. May 11, 2016); *Lopez v. Superintendent of Five Points Correctional Facility*, No. 14-CV-4615 (RJS) (JLC), 2015 WL 1300030, at *12 (S.D.N.Y. Mar. 15, 2015) (same), *adopted by*, 2015 WL 2408605 (S.D.N.Y. May 20, 2015).

Accordingly, Scott's claim regarding the weight of the evidence fails to articulate a basis for habeas relief.

>  ii. A Finding That There Was Sufficient Evidence to Establish Scott's Guilt of Rape and Assault Would Not Be Objectively Unreasonable

The Court is aware that some federal courts have treated weight of the evidence claims, without more, as though they raise a sufficiency claim in the context of habeas review.[8] "[T]o the extent the law remains unclear on this point

---

[8] Courts have treated a "weight" claim as a "sufficiency" claim on the ground of construing the *pro se* petitioner's complaint liberally. *See, e.g., Quintana*, 2014 WL 6749207, at *6 (finding *pro se* petitioner could not pursue weight claim because it was not cognizable on habeas review, but also "even if [petitioner]'s claim were to be construed as a sufficiency of the evidence claim, it is clear that he would not be entitled to relief"); *Bester v. Conway*, 778 F. Supp. 2d 339, 346 (W.D.N.Y. 2011) ("[S]ome habeas courts have construed weight-of-the-evidence claims as insufficiency-of-the-evidence claims. Even if the Court were to construe [*pro se* petitioner's] petition liberally as raising a claim that the evidence was legally insufficient to support the verdict, habeas relief still would not be warranted.") (citation omitted); *Ventura v. Artuz*, No. 99-CV-12025 (AJP), 2000 WL 995497, at *7 (S.D.N.Y. 2000) (Petitioner "contends that the jury's verdict was against the weight

48

and in an abundance of caution," the Court will address the merits of Scott's claim as if it had been properly presented as a sufficiency claim. *Lopez*, 2015 WL 1300030, at \*16. Construing Scott's claim as one under the Fourteenth Amendment and as exhausted, it still does not provide grounds for habeas relief because a decision that there was sufficient evidence to sustain the convictions would not be objectively unreasonable.

As a preliminary matter, to the extent the First Department decided that the verdict in Scott's trial was not against the weight of the evidence, it necessarily decided there was sufficient evidence to support the verdict. *See, e.g., Parker v. Ercole*, 666 F.3d 830, 835 (2d Cir. 2012) (state court's review of weight claim "necessarily subsumed review of [petitioner's] sufficiency claim"); *Moore v. Ercole*,

---

of the evidence . . . . [A] pro se petitioner's pleadings are construed liberally and interpreted to raise the strongest arguments that they suggest . . . . The Court therefore will assume that [petitioner] wished to raise a sufficiency of the evidence argument, and addresses that argument.") (citations omitted). Courts have also construed "weight" claims as "sufficiency" claims for the purposes of habeas exhaustion. *See, e.g., Liberta v. Kelly*, 839 F.2d 77, 80 n.1 (2d Cir. 1988) (remarking that distinction between "weight" and "sufficiency" claims for purpose of exhaustion is "frivolous," and noting "New York courts, when reviewing the evidence in support of a criminal conviction, have consistently adhered to a standard that is virtually identical to the standard set forth in *Jackson v. Virginia*"); *see also Lopez*, 2015 WL 1300030, at \*16 (collecting cases in which federal courts have treated "weight" claims as "sufficiency" claims for purposes of habeas exhaustion). However, notwithstanding the footnote in *Liberta*, more recent cases that have analyzed the nature of "weight" and "sufficiency" claims have concluded that, at least when considering whether a habeas petitioner has exhausted state court remedies, "a weight claim cannot stand in for a constitutional sufficiency claim." *Id.* (citing *Martin v. Brown*, No. 08-CV-0316 (JFB), 2010 WL 1740432, at \*7 n.4 (E.D.N.Y. Apr. 29, 2010); *Thomas v. Fischer*, No. 05-CV-3010 (DLC), 2007 WL 1988273, at \*2-4 (S.D.N.Y. July 6, 2007); *Peralta v. Bintz*, No. 00-CV-8935 (HB)(GWG), 2001 WL 800071, at \*5 (S.D.N.Y. July 16, 2001)).

No. 08-CV-4356 (ENV), 2012 WL 3764060, at *4 n.4 (E.D.N.Y. Aug. 29, 2012) (state court necessarily reviewed and rejected sufficiency claim where it found verdict was not against weight of evidence); *People v. Danielson*, 9 N.Y.3d 342, 349 (2007) ("Necessarily, in conducting its weight of the evidence review, a court must consider the elements of the crime, for even if the prosecution's witnesses were credible their testimony must prove the elements of the crime beyond a reasonable doubt."); *People v. Rogers*, 94 A.D.3d 1246, 1250 n.1 (3d Dep't 2012) ("we assess the sufficiency of the evidence as part of our weight of the evidence review") (citing to *Danielson*, 9 N.Y.3d at 348-49).

The Due Process Clause of the Fourteenth Amendment requires that a criminal conviction be based on "'proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the defendant] is charged.'" *Einaugler v. Sup. Ct. of N.Y.*, 109 F.3d 836, 839 (2d Cir. 1997) (quoting *In re Winship*, 397 U.S. 358, 364 (1970)). The clearly established federal law that a reviewing court must apply for reviewing a sufficiency claim is set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979), which requires a state court reviewing a conviction to uphold the guilty verdict so long as, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 318-19 (emphasis in original); *see also, e.g., Santone v. Fischer*, 689 F.3d 138, 148 (2d Cir. 2012); *Rosa*, 11 F.3d at 337 (citing cases). "[T]he only question under *Jackson* is whether [a] finding was so insupportable as to fall below the threshold of bare

rationality." *Coleman v. Johnson*, 132 S. Ct. 2060, 2065 (2012). Thereafter,

applying AEDPA's "objectively unreasonable" standard, "a state-court decision

rejecting a [*Jackson*] sufficiency challenge may not be overturned on federal habeas

unless the decision was 'objectively unreasonable.'" *Parker v. Matthews*, 132 S. Ct.

2148, 2152 (2012) (per curiam) (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per

curiam)) (other internal quotation marks omitted). Thus, a habeas petitioner

challenging the sufficiency of the evidence to support a state-court conviction "bears

a very heavy burden," *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002)

(internal quotation marks omitted), because AEDPA establishes a "'twice-

deferential'" standard of review. *Santone*, 689 F.3d at 148 (quoting *Matthews*, 132

S. Ct. at 2152).

Under *Jackson*, "federal courts must look to state law for the 'substantive

elements of the criminal offense.'" *Coleman v. Johnson*, 132 S. Ct. at 2064 (quoting

*Jackson*, 443 U.S. at 324 n.16). To establish Scott's guilt of rape in the first degree,

the prosecution had to prove that (1) he engaged in sexual intercourse with L.R. by

(2) forcible compulsion. *See* N.Y. Penal Law § 130.35(1); SR. at 25. To establish

Scott's guilt of assault in the second degree, the prosecution had to prove that (1) in

the course of and in furtherance of the commission or attempted commission of a

felony (in this case, rape in the first degree), (2) Scott caused physical injury to L.R.

N.Y. Penal Law § 120.05(6); SR. at 26. To establish Scott's guilt of assault in the

third degree, the prosecution had to prove that, with intent to cause physical injury

to another person, Scott caused such injury to L.R. *See* N.Y. Penal Law § 120.00(1);

51

SR. at 26. "The law is that 'the testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction[ ] and . . . such a principle has deep roots in our system of justice.'" *Arriaga v. Warden, Sing Sing Corr. Facility*, No. 13-CV-6060, 2016 WL 3748495 (JFK), at \*15 (S.D.N.Y. July 11, 2016) (quoting *United States v. Frampton*, 382 F.3d 213, 222 (2d Cir. 2004)) (quoting *United States v. Danzey*, 594 F.2d 905, 916 (2d Cir. 1979)) (internal quotation marks omitted). "This is true even when the eyewitnesses testimony is 'less than inspiring' because of its consistency." *Id.* (quoting *Edwards v. Jones*, 720 F.2d 751, 755 (2d Cir. 1983)).

L.R.'s uncorroborated eyewitness testimony as to the elements of the crimes is sufficient to support Scott's convictions related to the events of August 22, 2009. L.R. testified at trial to the elements of each charge. With regard to the assault in the third degree, she testified that on August 22, Scott accused her of receiving a call from another man and struck her, causing her cheek to feel swollen, her lip to bleed, and resulting in a chipped tooth. TR. at 30-36. With regard to the rape and assault in the second degree, she testified that Scott pushed her down and choked her, that she kicked him and told him to stop, and that Scott put his penis in her vagina. TR. at 40-42. Her single, eyewitness testimony, even uncorroborated, is sufficient to support conviction. *See Edwards*, 720 F.2d at 755; *see also, e.g.*, *Means v. Barkley*, No. 98-CV-7603 (DLC), 2000 WL 5020, at \*4 (S.D.N.Y. Jan 4, 2000) (rejecting habeas legal sufficiency claim and reasoning that "[t]he testimony of a single uncorroborated witness is sufficient to achieve a showing of guilt beyond a reasonable doubt . . . even if that witness's testimony is less than entirely

consistent") (citing *Danzey*, 594 F.2d at 916). In addition, "[i]t is well settled that where, as here, the government's case is based primarily on eyewitness testimony describing criminal activity, 'any lack of corroboration goes only to the weight of the evidence, not to its sufficiency.'" *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997) (quoting *United States v. Roman*, 870 F.2d 65, 71 (2d Cir. 1989)).

Scott did not challenge whether L.R. had testified to the elements of the crimes but rather challenged her credibility. Scott contended on appeal that his conviction should be reversed because the only eyewitness to the events on August 22, L.R., was not credible: "[t]he verdict in this one-witness case cannot stand where [LR.'s] testimony was wholly uncorroborated and substantially contradicted." SR. at 327.

It is well-established that credibility determinations are to be made by the fact-finder and are not reviewable by a federal habeas court. *See, e.g., Schlup*, 513 U.S. at 330 ("The *Jackson* standard . . . looks to whether there is sufficient evidence which, if credited, could support the conviction . . . . under *Jackson*, the assessment of the credibility of witnesses is generally beyond the scope of review."); *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996) ("assessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on appeal; we defer to the jury's assessments of both of these issues"); *Coble v. Rock*, No. 12-CV-6587 (NSR) (PED), 2013 WL 5323733, at *13 (S.D.N.Y. Sept. 20, 2013) ("It is well established that credibility determinations are to be made by the jury and therefore, credibility is not reviewable by a federal habeas court.").

In addition, great deference is due to the credibility determinations of judges

acting as fact-finders at bench trials. *See, e.g., Vt. Microsystems, Inc. v. Autodesk,*

*Inc.,* 88 F.3d 142, 151 (2d Cir. 1996) ("Credibility determinations . . . after a bench

trial are entitled to great deference and will not be overturned on appeal unless

clearly erroneous."); *Harris v. Artus,* 13-CV-6672 (MAT), 2015 WL 521332 at *4

(W.D.N.Y. Feb. 9, 2015) (rejecting sufficiency claim and discussing credibility

determinations at bench trial: "[i]t is well settled, however, that a federal habeas

court is not authorized to revisit a fact-finder's credibility determinations");

*DeGiorgio v. Fitzpatrick,* 08-CV-6551 (KMK) (LMS), 2011 WL 10501908, at *7

(S.D.N.Y. Mar. 8, 2011) (rejecting sufficiency claim: "[i]n a bench trial, credibility

assessments are the sole province of the presiding judge"). The deference due to

fact-finders' credibility determinations is not defeated by the existence of conflicts or

contradictions in testimony. *United States v. Best,* 219 F.3d 192, 200 (2d Cir. 2000)

("[W]here there are conflicts in the testimony, we defer 'to the jury's determination

of the weight of the evidence and the credibility of the witnesses.'") (quoting *United

States v. Morrison,* 153 F.3d 34, 49 (2d Cir. 1998)); *see also, e.g., United States v.

Vasquez,* 267 F.3d 79, 91 (2d Cir. 2001) ("The jury chose to believe the witnesses'

testimony despite any inconsistencies. We will defer to the jury's assessment of

credibility."); *Jamison v. Griffin,* No. 15-CV-6716 (PKC) (AJP), 2016 WL 1698350 at

*31 (S.D.N.Y. Apr. 27, 2016) ("The jury's decision was largely a matter of choosing

whether to believe the defense's version of the events or to believe the version

offered by the State . . . . Even if there had been major inconsistencies in the

witnesses' testimony . . . that would not change the result.") (internal quotation marks and brackets omitted).

Based on the record, Scott cannot meet the "very heavy burden" faced by a petitioner making a sufficiency challenge under AEDPA. *Ponnapula*, 297 F.3d at 179. Scott's counsel challenged L.R.'s credibility throughout the trial and the trial judge still found her to be credible. In his summation, Scott's counsel characterized L.R.'s testimony about the events of August 22 as "completely uncorroborated," "inconsistent," and "contradicted by other witnesses," and her account as "totally unreliable, totally incredible." TR. at 752-53, 837. The trial judge nonetheless found Scott guilty of rape and assault and, at sentencing, said, "I reached my verdict after carefully considering all of the evidence . . . . [L.R.] was a thorough credible witness." ST. at 37. The First Department found that there was "no basis for disturbing the court's credibility determinations." SR. at 431; *Scott*, 126 A.D.3d at 645. For the purpose of habeas review, the trial judge's determination that L.R. was a credible witness is "generally beyond the scope of review," *Schlup*, 513 U.S. at 330, and even if the First Department had rejected a sufficiency claim, it would not have been an objectively unreasonable application of *Jackson*, which requires the court to uphold Scott's verdict so long as, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 318-19.

A finding that there was sufficient evidence for Scott's convictions stemming from the August 22 incident would thus not be objectively unreasonable. L.R. offered eyewitness testimony to satisfy the elements of each charge, which is sufficient to support the convictions, and her testimony was found credible by the fact-finder, a finding that must be given great deference. Therefore, if the Court construes Scott's claim challenging the weight of the evidence as an exhausted sufficiency claim, it should still be denied.

### b. Scott's Other Sentencing Claims are Not Cognizable

On direct appeal, Scott argued that his sentence should be reduced for a number of reasons. In addition to asserting that he was penalized for exercising his right to trial, discussed *supra* in section II.B.2.b, he contended that a reduced sentence would be appropriate because the evidence against him was weak, and because he had presented mitigating evidence suggesting he was leading a productive life. SR. at 334-37. The First Department rejected Scott's arguments, and refused to reduce the sentence. *Scott*, 126 A.D.3d at 645; SR. at 434.

With the exception of the vindictive sentencing claim, Scott's sentencing claims are not cognizable on habeas review both because the sentence was within the range prescribed by law and the claims raise issues of purely state law. Generally, sentencing claims are not cognizable on habeas review if the sentence is within the range prescribed by law. *See, e.g., White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992); *Lleshi v. LaClair*, No. 13-CV-5874 (VB) (JCM), 2017 WL 1319798, at *13 (S.D.N.Y. Jan. 26, 2017) ("It is well settled that when a sentence is in accord

with the range established by state statutory law there is no constitutional issue presented for habeas review.") (citation omitted), *adopted by*, 2017 WL 1319927 (S.D.N.Y. Apr. 7, 2017). Scott, a second violent felony offender who was convicted of rape in the first degree, a class B violent felony, was facing a sentencing range of 10 to 25 years incarceration for the rape charge, and post-release supervision for 10 to 25 years. *See* N.Y. Penal Law § 70.04(3)(a), 70.45(2-a)(i). The judge's aggregate sentence of 20 years of incarceration and 10 years post-release supervision was thus within the legal sentencing range for the rape conviction.

Additionally, sentencing claims are not reviewable by a federal habeas court if they are merely state law claims. *See Saracina v. Artus*, 452 F. App'x 44, 46 (2d Cir. 2011) ("Whether a New York court erred in applying a New York recidivist sentencing enhancement statute is a question of New York State law, not a question of fact. And it is well-established that [i]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.") (internal quotation marks omitted); *Herring v. Capra*, No. 13-CV-8946 (CS) (LMS), 2016 WL 7388649, at *4 (S.D.N.Y. Nov. 2, 2016) ("Petitioner's sentencing claim is predicated solely on New York's statutory sentencing scheme and is not cognizable on habeas review. Whether a sentence should run concurrently or consecutively is purely an issue of state law and is not cognizable on federal habeas review.") (citation omitted), *adopted by*, 2016 WL 7378976 (S.D.N.Y. Dec. 20, 2016).

In sum, because Scott's other sentencing claims present solely questions of state law and because his sentence was within the legal sentencing range, his

claims are not further reviewed here. With the exception of the vindictive

sentencing claim, discussed *supra* in section II.B.2.b, and which the Court concludes

has no merit, the Court recommends rejecting Scott's other sentencing claims on the

ground that they are not cognizable on habeas review.

### III. CONCLUSION

For all these reasons, I recommend that Scott's petition for a writ of habeas

corpus be denied.

### PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties have fourteen (14) days (including weekends and holidays)

from service of this Report and Recommendation to file any objections (plus three

days because the Report is being mailed to Petitioner). *See* Fed. R. Civ. P. 6(a), (b),

(d). A party may respond to any objections within fourteen (14) days after being

served. Such objections, and any responses to objections, shall be filed with the

Clerk of Court, with courtesy copies delivered to the chambers of the Honorable

Katherine Polk Failla and the undersigned, United States Courthouse, 500 Pearl

Street, New York, New York 10007. Any requests for an extension of time for filing

objections must be directed to Judge Failla.

**FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL
RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE
APPELLATE REVIEW.** 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72. *See Thomas v.
Arn*, 474 U.S. 140 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis,*

*Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010). If Scott does
not have access to cases cited herein that are reported on LexisNexis or Westlaw, he
should request copies from counsel for the Respondent. *See Lebron v. Sanders*, 557
F.3d 76, 79 (2d Cir. 2009); Local Civil Rule 7.2, Local Rules of the United States
District Courts for the Southern and Eastern Districts of New York.

Dated: New York, New York
     June 29, 2017

JAMES L. COTT
United States Magistrate Judge

A copy of this Report and Recommendation has been mailed to:

Andre Scott
11-A-1841
Auburn Correctional Facility
P.O. Box 618
Auburn, NY 13024

59